**REED SMITH LLP**
*Formed in the State of Delaware*
Aaron M. Bender, Esq. (015642004)
David G. Murphy, Esq. (069822013)
506 Carnegie Center – Suite 300
Princeton, New Jersey 08540
Tel (609) 987-0050

*Attorneys for Trane U.S. Inc., F. Greek Development, Inc., and Three Cubed, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CENTENNIAL PLAZA PROP, LLC and IMARC PROPERTIES, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> TRANE U.S., INC., F. GREEK DEVELOPMENT, INC. and THREE CUBED, LLC, <br><br> Defendants. | Case No.: 2:22-cv-01262-JMV-MAH <br><br> *Document Filed Electronically* <br><br> **MEMORANDUM OF LAW IN SUPPORT OF THIS COURT'S SUBJECT MATTER JURISDICTION** |
| TRANE U.S. INC., <br><br> Third-Party Plaintiff, <br><br> v. <br><br> SAM SPREI, IRA RUSSACK, JONATHAN RUBIN, CENTENNIAL JV LLC, JOHN DOES 1-10, and ABC ENTITIES. 1-10, <br><br> Third-Party Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................1

RELEVANT PROCEDURAL HISTORY ..............................................................3

STANDARD OF REVIEW ..................................................................................9

LEGAL ARGUMENT .......................................................................................11

I.     PLAINTIFFS FRAUDULENTLY JOINED FGDI AND THREE CUBED IN CENTENNIAL II ..........................................................11

     A.     Plaintiffs' Claims Are Meritless Against All Defendants Because Plaintiffs Lack Statutory Standing ...................................13

          i.     Statutory Standing Is Not A Jurisdictional Defect That Impacts Trane's Removal To This Court .................................14

          ii.     The Court Should Apply Delaware Law If It Finds A Conflict Between Delaware And New Jersey Law .................15

          iii.     Under Delaware Law, Centennial Ceased To Be In Good Standing Because It Failed To Pay Taxes ..............................18

          iv.     Both Plaintiffs Failed To Produce Certificates Of Authority To Transact Business In the State Of New Jersey..................................................................................19

     B.     Plaintiffs' Claims In Centennial II Are Barred By The Law Of The Case Doctrine ..........................................................20

     C.     Plaintiffs Cannot Possibly State A Viable Claim Against FGDI And Three Cubed For Tortious Interference With Prospective Contractual Relations ..........................................................21

II.     EVEN IF NOT FRAUDULENTLY JOINED, FGDI AND THREE CUBED ARE NOMINAL PARTIES, THUS THEIR CITIZENSHIP IS NOT CONSIDERED FOR PURPOSES OF DIVERSITY..........................23

III.    RUBIN'S MEMBERSHIP INTEREST IN CENTENNIAL IS A SHAM DESIGNED TO MANIPULATE THIS COURT'S JURISDICTION .........................................................................................24

    A.    Rubin's Narrative That He Has A Membership Interest In Centennial Through A Converted Loan Is Defective .........................25

    B.    During Jurisdictional Discovery, Plaintiffs Failed To Produce Evidence That Russack Transferred A Membership Interest To Rubin In Accordance With The Amended Operating Agreement......31

        i.    Counsel's Narrative That Rubin Funded A Loan To Centennial By Wiring "Back" $500,000 Owed To A Different Corporate Entity Is Baseless .....................................31

        ii.    The Certification of Sam Sprei Adds More Contradictory And Convoluted Facts To Rubin's Alleged Membership ........32

        iii.    The Documents Produced By Plaintiffs Refute Their Narratives, And Confirm That Rubin's Membership In Centennial Is A Sham .............................................................36

    CONCLUSION ...............................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Dredging Co. v. Atl. Sea Con, Ltd.*,
  637 F. Supp. 179 (D.N.J. 1986)............................................................................11

*Batoff v. State Farm Ins. Co.*,
  977 F.2d 848 (3d Cir. 1992) ................................................................................12

*Blackman & Co. v. GE Bus. Fin. Servs.*,
  No. 15-7274, 2016 U.S. Dist. LEXIS 56576 (D.N.J. Apr. 28, 2016) ..........11, 12

*Boyer v. Snap-on Tools Corp.*,
  913 F.2d 108 (3d Cir. 1990) ...........................................................................12, 23

*Bryant v. City of Atl. City*,
  309 N.J. Super. 596, 707 A.2d 1072 (App. Div. 1998)......................................25

*Bumberger v. Insurance Co. of N. Am.*,
  952 F.2d 764 (3d Cir. 1991) ..........................................................................23, 24

*Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*,
  256 F. Supp. 2d 249 (D.N.J. 2003).....................................................................22

*Chantz Enters., Ltd. Liab. Co. v. JHL Brighton Design/Decor Ctr.,
  Ltd. Liab. Co.*,
  No. 09C-06-072 MJB, 2010 Del. Super. LEXIS 266 (Del. Super.
  Ct. June 30, 2010) ...............................................................................................15

*CNA v. United States*,
  535 F.3d 132 (3d Cir. 2008) ............................................................................9, 10

*Davis v. Wells Fargo*,
  824 F.3d 333 (3d Cir. 2016) ................................................................................10

*GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*,
  888 F.3d 29 (3d Cir. 2018) ..................................................................................10

*Gould Elec., Inc. v. United States*,
  220 F.3d 169 (3d Cir. 2000) ..................................................................................9

*HWI Partners, LLC v. Choate, Hall & Stewart LLP*,
No. 13-918-RGA-MPT, 2013 U.S. Dist. LEXIS 174942 (D. Del.
Dec. 11, 2013)....................................................................................................15

*In re Briscoe*,
448 F.3d 201 (3d Cir. 2006) ...................................................................11, 12, 13

*In re Cendant Corp. Litig.*,
264 F.3d 286 (3d Cir. 2001) ...............................................................................25

*Kallman v. Aronchick*,
981 F. Supp. 2d 372 (E.D. Pa. 2013)...................................................................12

*Katz v. Six Flags Great Adventure, LLC*,
No. 18-116, 2018 U.S. Dist. LEXIS 135913 (D.N.J. Aug. 13,
2018) ....................................................................................................................14

*Kounelis v. Sherrer*,
529 F. Supp. 2d 503 (D.N.J. 2008)......................................................................39

*Las Vegas Sands Corp. v. Ace Gaming, LLC*,
713 F. Supp. 2d 427 (D.N.J. 2010)......................................................................16

*Lewis v. La. State Univ.*,
No. 21-198-SM-RLB, 2021 U.S. Dist. LEXIS 172510 (M.D. La.
Sep. 10, 2021) ......................................................................................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377, 188 L. Ed. 2d 392 & n.4 (2014)...............................................14

*Leyse v. Bank of Am. Nat'l Ass'n*,
804 F.3d 316 (3d Cir. 2015), ), *rep't & rec. adopted* 2020 U.S.
Dist. LEXUS 48564 (D.N.M. Mar. 20, 2020) ....................................................14

*Mark IV Transp. & Logistics, Inc. v. Lightning Logistics, LLC*,
No. 09-6480 (ES), 2014 U.S. Dist. LEXIS 172588 (D.N.J. Dec. 12,
2014) ...............................................................................................................16, 17

*Mayes v. Rapoport*,
198 F.3d 457 (4th Cir. 1999) ..............................................................................13

*McCann v. Newman Irrevocable Tr.*,
458 F.3d 281 (3d Cir. 2006) ...............................................................................10

*Monroe v. Ethicon, Inc.*,
   No. 19-5384, 2019 U.S. Dist. LEXIS 219722 (E.D. Pa. Dec. 23,
   2019) ....................................................................................................21

*Mortensen v. First Fed. Sav. & Loan Ass'n*,
   549 F.2d 884 (3d Cir. 1977) ................................................................10

*Navarro Sav. Ass'n v. Lee*,
   446 U.S. 458, 64 L. Ed. 2d 425, 100 S. Ct. 1779 (1980) ...................24

*Papp v. Fore-Kast Sales Co.*,
   842 F.3d 805 (3d Cir. 2016) ..................................................................9

*Phillips v. TDI Lakota Holdings, LLC*,
   No. 10-cv-782, 2011 U.S. Dist. LEXIS 165835 (E.D. Pa. Apr. 29,
   2011) ....................................................................................................16

*Sanchez v. L3 Harris Techs., Inc.*,
   No. 20-5555, 2021 U.S. Dist. LEXIS 199007 (D.N.J. Oct. 14,
   2021) ..............................................................................................11, 13

*Shamblin v. Chesapeake Energy Corp.*,
   No. 3:12-CV-0089, 2012 U.S. Dist. LEXIS 73070 (M.D. Pa. May
   25, 2012) ..............................................................................................16

*Spring-Ford Area Sch. Dist. v. Genesis Ins. Co.*,
   158 F. Supp. 2d 476 (E.D. Pa. 2001).............................................12, 23

*St. Paul Mercury Indemnity Co. v. Red Cab Co.*,
   303 U.S. 283 (1938).............................................................................10

*Steel Valley Auth. v. Union Switch and Signal Div.*,
   809 F.2d 1006 (3d Cir. 1987) ..............................................................10

*Strickland v. Madden Sales & Serv.*,
   No. 19-918  MV/JFR, 2020 U.S. Dist. LEXIS 50144 (D.N.M. Feb.
   10, 2020) ..............................................................................................14

*U.S. D.I.D. Corp. v. Windstream Communs., Inc.*,
   916 F. Supp. 2d 501 (S.D.N.Y. 2013), *vac'd in part, aff'd in
   relevant part*, 775 F.3d (2d Cir. 2014)................................................20

*U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*,
  473 F.3d 506 (3d Cir. 2007) ...............................................................................9

*United States v. Wexler*,
  31 F.3d 117 (3d Cir. 1994) ...............................................................................25

*Werwinski v. Ford Motor Co.*,
  286 F.3d 661 (3d Cir. 2002) .............................................................................10

**Statutes**

6 *Del. C.* § 18-102 ................................................................................................33

6 *Del. C.* §§ 18-305, 18-502 to -504 ...................................................................39

6 *Del. C.* §1107(b), (c) .......................................................................................18

6 *Del. C.* §1107(h)..............................................................................................18

6 *Del. C.* §1107(l) ..............................................................................................18

*N.J.S.A.* 42:2C-32 to 35; -40 .............................................................................39

*N.J.S.A.* 42:2C-57(a)(2) .....................................................................................16

*N.J.S.A.* 42:2C-58..............................................................................................19

*N.J.S.A.* 42:2C-61..............................................................................................33

*N.J.S.A.* 42:2C-65(a) .........................................................................................19

**Rules**

*Fed. R. Civ. P.* 19 ...............................................................................................12

**Other Authorities**

11 Wright & Miller, Federal Practice & Procedure § 2972....................................20

## PRELIMINARY STATEMENT

In this commercial real estate dispute, regarding condominium units located at One Centennial Avenue, Piscataway, New Jersey 08854 (Units A and D are the "Trane Units" and Units B and C are the "Plaintiffs' Units"), Defendant and Third-Party Plaintiff Trane U.S. Inc. ("Trane") and Defendants F. Greek Development, Inc. ("FGDI") and Three Cubed, LLC ("Three Cubed") (collectively with Trane, "Defendants") submit this memorandum of law in support of this Court's subject matter jurisdiction, in defense of Trane's removal of this matter to this Court, and in opposition to Plaintiffs Centennial Plaza Prop, LLC ("Centennial") and Imarc Properties, LLC's ("Imarc", and collectively, "Plaintiffs") challenges to this Court's subject matter jurisdiction. As set forth in detail below, this Court has jurisdiction to preside over the parties' dispute.

***First***, Plaintiffs' factual challenge to the Court's jurisdiction—that Centennial has a previously undisclosed member who resides in New Jersey, and thus destroys complete diversity—is irrelevant because the non-diverse defendants, FGDI and Three Cubed, were fraudulently joined by Plaintiffs. Plaintiffs' claims against FGDI and Three Cubed are wholly insubstantial and frivolous for multiple reasons: Plaintiffs lack the capacity to sue *anyone* under Delaware and New Jersey law governing limited liability companies, Plaintiffs' claims are barred by the law of the

- 1 -

case doctrine, and Plaintiffs simply cannot state a colorable tortious interference claim against FGDI and Three Cubed.

**_Second_**, even if the Court were to generously conclude that it may be merely possible for Plaintiffs to state a claim against FGDI and Centennial (it is not), the Court should still disregard FGDI and Centennial as nominal parties.  If a defendant is not a necessary party under _Fed. R. Civ. P._ 19, and its inclusion in a case destroys diversity jurisdiction, the Court may disregard that defendant's citizenship.  Here, if not fraudulently joined, FGDI and Three Cubed are, at minimum, nominal parties.

**_Third_**, Plaintiffs' factual jurisdictional challenge is completely debunked by documentary evidence.  Plaintiffs set forth a series of changing, contradictory narratives for how Jonathan Rubin, the hidden lender of Centennial, became a member of Centennial and rendered it a New Jersey citizen for diversity purposes. Yet, Plaintiffs overlook that the alleged transfer of a membership interest to Rubin did not comply with Centennial's controlling operating agreement, which required Rubin to supply several documents to make the transfer effective, but those documents clearly do not exist.  In reality, Plaintiffs' theories do not survive examination of the controlling documents that they cite, which reveal that Jonathan Rubin's membership is, at best, illusory and a sham.

For these reasons, and as fully set forth in detail below, Trane's removal was proper, Defendants have established by a preponderance of the evidence that this

Court has subject matter jurisdiction over this case, and this matter should proceed to adjudication on the merits in this forum.

## **RELEVANT PROCEDURAL HISTORY**

On February 4, 2022, Plaintiffs initiated a prior matter by filing an Order to Show Cause with Temporary Restraints and Verified Complaint in the Superior Court of New Jersey, Chancery Division, Middlesex County under docket number MID-C-13-22 ("*Centennial I*"). (Case No. 2:22-cv-793, Dkt. No. 1-1). In their Verified Complaint in *Centennial I*, Plaintiffs named only one defendant: Trane Technologies Company, LLC.[1] *Id.* On February 7, 2022, the Chancery Division issued the Order to Show Cause with Temporary Restraints, which prevented Trane from transferring ownership of the Trane Units, which it was under contract to sell. (Case No. 2:22-cv-793, Dkt. No. 1-2).

Trane removed *Centennial I* to this Court on February 14, 2022 and moved to dissolve the temporary restraints. (Case No. 2:22-cv-793, Dkt. Nos. 1-1, 2). On February 15, 2022, the Court held a telephone conference regarding Trane's removal, and in relevant part, the Court Ordered Plaintiffs to file any challenge to the Court's subject matter jurisdiction no later than February 18, 2022. (Case No.

---

[1] Trane U.S. Inc., as the entity in interest, clarified that Trane Technologies Company, LLC was improperly named as the defendant. *See generally id.*

2:-22-cv-793, Dkt. Nos. 4-5). Plaintiffs never challenged the Court's subject matter jurisdiction in *Centennial I*. (*See generally* Case No. 2:22-cv-793).

On February 25, 2022, this Court heard oral argument on Plaintiffs' Order to Show Cause, and Trane's cross-motion to dissolve temporary restraints. (Case No. 2:22-cv-793, Dkt. Nos. 5, 9, 10, 28). The Court granted Trane's cross-motion, dissolved the temporary restraints on Trane's ability to sell the Trane Units, and denied Plaintiffs' request for a stay pending Plaintiffs' interlocutory appeal. (Case No. 2:22-cv-793, Dkt. Nos. 10, 28). The Court held that Plaintiffs had no chance of success on the merits, thus, Plaintiffs were not entitled to preliminary injunctive relief in the form of blocking Trane from selling the Trane Units. (Case No. 2:22-cv-793, Dkt. No. 28 at 25:10-37:11).

Following the Court's February 25, 2022 Order, Plaintiffs filed numerous applications and documents in desperation to block Trane's sale of the Trane Units, which was scheduled at that time for March 4, 2022:

- On February 25, 2022, Plaintiffs filed an interlocutory appeal with the United States Court of Appeals for the Third Circuit. (Case No. 2:22-cv-793, Dkt. No. 12; App. Case No. 22-1353, Dkt. Nos. 1-3).

- That same day, Plaintiff filed a motion for reconsideration of the Court's February 25, 2022 Order. (Case No. 2:22-cv-793, Dkt. No. 11).

- In the appeal, on March 1, 2022, Plaintiffs filed an emergent motion for a stay of the Court's February 25, 2022 Order. (App. Case. No. 22-1353, Dkt. No. 5).

- 4 -

- On March 2, 2022, Plaintiffs recorded a *lis pendens* on the Trane Units, bearing the docket numbers for *Centennial I* and the appeal, to cloud Trane's title. Certification of Aaron M. Bender, Esq. ("*Bender Cert.*"), Ex. 1.

Plaintiffs' *lis pendens*, though unjustified and improper, prevented Trane from selling the Trane Units on March 4, 2022. Each of Plaintiffs' other litigation tactics failed: The Third Circuit denied Plaintiffs' motion for a stay on March 3, 2022, (App. Case No. 22-1353, Dkt. No. 21), and this Court denied Plaintiffs' motion for reconsideration on March 7, 2022. (Case No. 2:22-cv-793, Dkt. No. 17).

On March 7, 2022, Trane filed several motions; Trane sought to discharge Plaintiffs' improper *lis pendens* and Trane sought civil contempt against Plaintiffs for their abuse of process. (Case No. 2:22-cv-793, Dkt. No. 18). While *Centennial I* was still pending, on March 7, 2022, Plaintiffs initiated this action ("*Centennial II*") by filing a second, nearly identical complaint in the Superior Court of New Jersey, Chancery Division, Middlesex County under docket number MID-C-24-22, along with a nearly identical Order to Show Cause with Temporary Restraints, *ex parte*. (Dkt. No. 1-1). Unlike *Centennial I*, however, in *Centennial II*, Plaintiffs named two additional defendants alongside Trane, FGDI and Three Cubed. (*Id.*). Plaintiffs also submitted another *lis pendens* to cloud Trane's title to the Trane Units,

this time under *Centennial II*'s Chancery Division docket number, and that *lis pendens* was recorded the next day.[2] *Bender Cert.*, Ex. 2.

After *Centennial II* was filed, on March 7, 2022, Plaintiffs filed a notice of voluntary dismissal, pursuant to *Fed. R. Civ. P.* 41(a)(1)(A)(i), to close the docket in *Centennial I*. (Case No. 2:22-cv-793, Dkt. No. 23).[3] With respect to *Centennial II*, on March 8, 2022, Trane removed it to this Court before FGDI and Three Cubed were served with Plaintiffs' Order to Show Cause and Verified Complaint, where it was assigned to the same presiding District Judge and Magistrate Judge. (Dkt. No. 1). On March 25, 2022, before the Court was scheduled to hear oral argument regarding whether Trane removed *Centennial II* prior to Plaintiffs serving FGDI and Three Cubed, Plaintiffs submitted a certification from Jonathan Rubin contending, for the first time, that Rubin had a membership interest in Centennial, and that as a New Jersey resident, he destroyed diversity jurisdiction. (Dkt. No. 17).

Plaintiffs made this representation despite their contrary representation on March 10, 2022, in a correspondence to the Court under the auspices of *Fed. R. Civ.*

---

[2] To date, the *Centennial II* notice of *lis pendens* remains recorded on the Trane Units and is preventing the sale of the Trane Units.

[3] While there was some additional analysis by the Court on whether Plaintiffs' notice of voluntary dismissal should be stricken, the Court entered an Order on April 18, 2022 confirming that *Centennial I* had been dismissed and closed. (Case No. 2:22-cv-793, Dkt. No. 38).

*P.* 11, that "[o]nce retained by our client, we learned that the entity's citizenship was inaccurately pled, and Centennial was registered in Delaware and is a New York resident for purposes of diversity jurisdiction." (Dkt. No. 7 at 2 n.1).

Later on March 25, 2022, the Court heard oral argument, and held that Trane properly removed *Centennial II* due to fact that FGDI and Three Cubed were not served prior to Trane filing its notice of removal. (Dkt. No. 23 at 26:18-37:2). For the remaining issues regarding the Court's jurisdiction, specifically whether complete diversity exists, the Court Ordered the parties to complete jurisdictional discovery. (Dkt. No. 23 at 38:3-40:7). To that end, the Court entered a Scheduling Order on March 25, 2022, setting the parameters of jurisdictional discovery, and setting an end date of July 31, 2022. (Dkt. No. 19).

On May 3, 2022, due to a dispute between the parties regarding Plaintiffs' responses to Trane's discovery demands, Trane submitted a letter application to the Court seeking to compel Plaintiffs to produce compliant discovery responses. (Dkt. No. 31). The Court held a telephonic conference on May 5, 2022, in which the Court extended Plaintiffs' time to furnish compliant discovery responses and permitting Trane to seek an adverse inference in the event Plaintiffs' responses were incomplete. (Dkt. No. 37).

On May 12, 2022, without alerting Defendants, Plaintiffs filed a discharge of the Notice of *Lis Pendens* in *Centennial I* (while the Notice of *Lis Pendens* in

*Centennial II* still remains on the County's public records for the Trane Units). *Bender Cert.*, Ex. 3.

On May 20, 2022, the Court entered a Scheduling Order regarding final briefing of the Court's subject matter jurisdiction; based on the parties' agreement and submissions, the Court confirmed that jurisdictional discovery had concluded, and that the parties were to submit their initial briefs on June 13, 2022, with responsive briefs due June 24, 2022, and oral argument scheduled for June 30, 2022. (Dkt. No. 40).

Following the close of jurisdictional discovery, the parties do not have any factual disputes concerning the citizenship of all parties other than Centennial in this matter. For clarity, each party's citizenship is as follows:

- Trane U.S. Inc. is incorporated in Delaware, and its principal place of business is in Davidson, North Carolina, thus it is a citizen of both Delaware and North Carolina. (Dkt. No. 1 at ¶ 10).

- F. Greek Development, Inc. is both incorporated and has its principal place of business in New Jersey, hence it is a New Jersey citizen. (Dkt. No. 1 at ¶ 20).

- Three Cubed, LLC is a limited liability company, and its membership is comprised of Frank A. Greek and David Greek, who are each domiciled in New Jersey, thus Three Cubed is a New Jersey citizen. (*See* Dkt. No. 1 at ¶ 20).

- Imarc Properties, LLC is a limited liability company with only one member, Ira Russack. Ira Russack is domiciled in New York, thus Imarc is a New York citizen for purposes of diversity. (Dkt. No. 1 at ¶¶ 11-13).

Defendants submit this brief in support of this Court's subject matter jurisdiction, and for the dismissal of FGDI and Three Cubed as fraudulently joined.

## STANDARD OF REVIEW

The question before the Court is functionally the equivalent of the inquiry for a motion for remand challenging subject-matter jurisdiction, or a motion to dismiss pursuant to *Fed. R. Civ. P.* 12(b)(1), which require the Court to complete virtually the same analysis. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016). When faced with a challenge to the Court's subject matter jurisdiction, the party seeking the federal forum bears the burden of establishing subject matter jurisdiction. *Gould Elec., Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

Challenges to the Court's jurisdiction have two flavors: facial or factual. A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns 'the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'" *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (quoting *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007)). In a "facial" attack, the Court considers only the allegations of the complaint and incorporated documents, construing everything in the light most favorable to the party seeking the federal forum. A "factual" attack, by contrast, does not require the Court to accept allegations as true; indeed, the Court may resolve

factual discrepancies attendant to jurisdiction.  *Id.* ("no presumption of truthfulness attaches to the allegations of the [party seeking federal jurisdiction]").

Here, the Court is presented with a factual challenge, as Plaintiffs insist that unpleaded facts revealed that complete diversity is lacking.  When facing a factual challenge, the party asserting jurisdiction has "the burden of proof to establish diversity jurisdiction by a preponderance of the evidence," *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 35 (3d Cir. 2018) (quoting *McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 288-89 (3d Cir. 2006)), and "the court 'is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

In terms of timing, because federal court jurisdiction was invoked through Trane's notice of removal, the facts and evidence must be assessed by the Court at the time of removal—new allegations, claims, composition of the parties, or proposed amended pleadings are irrelevant.  *See, e.g., St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283 (1938) ("The status of the case as disclosed by the plaintiff's complaint is controlling in the case of a removal…."); *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666 (3d Cir. 2002) (quoting *Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987)).

## LEGAL ARGUMENT

### I.    PLAINTIFFS FRAUDULENTLY JOINED FGDI AND THREE CUBED IN *CENTENNIAL II*

The Court need not determine whether Centennial is a New Jersey citizen or not, based on Rubin's alleged membership, because the non-diverse defendants, FGDI and Three Cubed, were fraudulently joined.

"A fraudulently joined, non-diverse party is 'an exception to the requirement that removal be predicated solely upon complete diversity[.]'" *Sanchez v. L3 Harris Techs., Inc.*, No. 20-5555, 2021 U.S. Dist. LEXIS 199007, at *5-6 (D.N.J. Oct. 14, 2021) (citing *In re Briscoe*, 448 F.3d 201, 215-16 (3d Cir. 2006)) (other citations omitted).  "In a suit with named defendants who are not of diverse citizenship from the plaintiff, the diverse defendant may still remove the action if it can establish that the non-diverse defendants were 'fraudulently' named or joined solely to defeat diversity jurisdiction." *In re Briscoe*, 448 F.3d at 216.

"'The standard for determining whether the joinder is fraudulent … [is whether] the plaintiff fails to state a cause of action against the resident defendant, and the failure is obvious according to the settled rules of the state.  If, however, there is a real possibility that the plaintiff has stated a cause of action, the joinder is not fraudulent, and the cause should be remanded.'"  *Blackman & Co. v. GE Bus. Fin. Servs.*, No. 15-7274, 2016 U.S. Dist. LEXIS 56576, at *17 n.4 (D.N.J. Apr. 28, 2016) (quoting *Am. Dredging Co. v. Atl. Sea Con, Ltd.*, 637 F. Supp. 179, 183

- 11 -

(D.N.J. 1986)).  In other words, removal is proper if "'there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment.'"  *Id.* (quoting *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990)).

Showing lack of "colorable grounds" is a heavy, but surmountable burden—the claim against the non-diverse defendant "must be wholly insubstantial and frivolous."  *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 852 (3d Cir. 1992).  The court "must assume as true all factual allegations of the complaint" and "resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff."  *Briscoe*, 448 F.3d at 217 (quoting *Batoff*, 977 F.2d at 851-52).  That said, where a claim is plainly and obviously meritless, or susceptible to a clear and obvious defense, the doctrine of fraudulent joinder applies.  *See, e.g.*, *id.* at 223-24 (fraudulent joinder applied to claims barred by statutes of limitations); *Spring-Ford Area Sch. Dist. v. Genesis Ins. Co.*, 158 F. Supp. 2d 476, 484 (E.D. Pa. 2001) (fraudulent joinder applied to defendants who were not necessary parties under *Fed. R. Civ. P.* 19); *Kallman v. Aronchick*, 981 F. Supp. 2d 372, 382 (E.D. Pa. 2013) (fraudulent joinder applied to a defendant that was labeled an "inventor" because the New Jersey Products Liability Act applied only to a "manufacturer or seller of a product").

"If the district court determines that joinder was fraudulent, it can 'disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction.'" *Sanchez*, 2021 U.S. Dist. LEXIS 199007, at \*5-6 (quoting *Briscoe*, 448 F.3d at 216 (citing *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1999))).

A.     **Plaintiffs' Claims Are Meritless Against All Defendants Because Plaintiffs Lack Statutory Standing**

All of Plaintiffs' claims are subject to immediate dismissal because both Centennial nor Imarc lack statutory capacity to sue.  Under Delaware law, when a limited liability company ceases to be in good standing for failure to pay taxes, it lacks capacity to commence lawsuits, thus Centennial cannot proceed with its claims.  Likewise, under New Jersey law, when a foreign limited liability company does not obtain a certificate of authority, it similarly lacks capacity to sue, thus neither Centennial nor Imarc had statutory standing to commence this lawsuit. Accordingly, at the time Trane removed this matter to this Court (and persisting through the date of this brief), both Centennial and Imarc's claims are subject to immediate and obvious dismissal, thus their claims are plainly fraudulent on these alternative grounds.

### i.    Statutory Standing Is Not A Jurisdictional Defect That Impacts Trane's Removal To This Court

To be clear, Plaintiffs' failures to comply with New Jersey and Delaware laws regarding limited liability companies do not concern issues of Article III standing they are matters of statutory standing.  If Plaintiffs lacked Article III standing, remand would be required.  *Katz v. Six Flags Great Adventure, LLC*, No. 18-116, 2018 U.S. Dist. LEXIS 135913, at *27 (D.N.J. Aug. 13, 2018).  "Unlike Article III standing, statutory standing is not jurisdictional…. [It] goes to whether Congress has accorded a particular plaintiff the right to sue under a statute, but it does not limit the power of the court to adjudicate the case." *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388, 188 L. Ed. 2d 392 & n.4 (2014)); *see also Strickland v. Madden Sales & Serv.*, No. 19-918 MV/JFR, 2020 U.S. Dist. LEXIS 50144, at *29 (D.N.M. Feb. 10, 2020) (holding that failure to comply with corporate registration requirements, resulting in lack of capacity to sue, does not create a jurisdictional defect that requires remand), *rep't & rec. adopted* 2020 U.S. Dist. LEXIS 48564 (D.N.M. Mar. 20, 2020); *Lewis v. La. State Univ.*, No. 21-198-SM-RLB, 2021 U.S. Dist. LEXIS 172510, at *15 (M.D. La. Sep. 10, 2021) (dismissing complaint under *Fed. R. Civ. P.* 12(b)(6)—not 12(b)(1)—where defendant made successful challenge to capacity to sue under *Fed. R. Civ. P.* 17(b)(3)).

- 14 -

Further, while compliance with registration statutes can be cured, and thus capacity to sue may be restored, *see Chantz Enters., Ltd. Liab. Co. v. JHL Brighton Design/Decor Ctr., Ltd. Liab. Co.*, No. 09C-06-072 MJB, 2010 Del. Super. LEXIS 266, at *9 (Del. Super. Ct. June 30, 2010), at this juncture the Court only considers the LLC's status "at the time of removal." *HWI Partners, LLC v. Choate, Hall & Stewart LLP*, No. 13-918-RGA-MPT, 2013 U.S. Dist. LEXIS 174942, at *11 (D. Del. Dec. 11, 2013).  Here, at the time of removal, and as set forth in detail below, Plaintiffs' claims were immediately and obviously subject to dismissal due to Plaintiffs' failure to comply with straightforward corporate law, thus each lacks the capacity to sue and *all* of their claims are fraudulent, including those against FGDI and Three Cubed.

> **ii.    The Court Should Apply Delaware Law If It Finds A Conflict Between Delaware And New Jersey Law**

Plaintiffs failed to comply with both New Jersey and Delaware law regarding limited liability companies.  To the extent that Plaintiffs or the Court observe a conflict between each state's regime, Trane submits that Delaware law applies, either directly or through New Jersey's incorporation of Delaware law.

*Fed. R. Civ. P.* 17(b)(3) governs this Court's determination of whether Plaintiffs has capacity to sue.  It provides that "[c]apacity to sue or be sued is determined … by the law of the state where the court is located," for entities that are neither individuals or corporations. *Id.*  Of course, a limited liability company is

- 15 -

neither an individual or corporation, yet some "federal district courts have found that the rule governs LLCs such that the state of an LLC's organization provides the parameters of its capacity." *Phillips v. TDI Lakota Holdings, LLC*, No. 10-cv-782, 2011 U.S. Dist. LEXIS 165835, at *4 (E.D. Pa. Apr. 29, 2011); *but see Shamblin v. Chesapeake Energy Corp.*, No. 3:12-CV-0089, 2012 U.S. Dist. LEXIS 73070, at *9 (M.D. Pa. May 25, 2012).

Nevertheless, if the Court applies New Jersey law, it eventually results in a roundabout application of Delaware law because the New Jersey Limited Liability Company Act ("NJLLCA") and Centennial's Amended Operating Agreement, *Bender Cert.*, Ex. 4 (CENT000089 at § 8.3), call for the application of Delaware law. *See Mark IV Transp. & Logistics, Inc. v. Lightning Logistics, LLC*, No. 09-6480 (ES), 2014 U.S. Dist. LEXIS 172588, at *7 (D.N.J. Dec. 12, 2014) (citing *N.J.S.A.* 42:2C-57(a)(2)).

Alternatively, the Court may conduct the "governmental-interest analysis," to the extent New Jersey and Delaware's laws conflict and call for divergent results, in which Trane submits that Delaware law would still apply. *Id.* at *8 (citing *Las Vegas Sands Corp. v. Ace Gaming, LLC*, 713 F. Supp. 2d 427, 443 (D.N.J. 2010)). In *Mark IV*, in analyzing a claim to pierce the corporate veil of an LLC formed under the laws of Tennessee, this Court concluded that Tennessee had a greater governmental interest than New Jersey in resolving the parties' dispute. Though the plaintiff was

- 16 -

incorporated and had its primary place of business in New Jersey, Tennessee had a stronger governmental interest because that is where the defendants were formed and had their principal place of business; the plaintiff's hometown interest of seeking relief against a tortfeasing foreign entity was surmounted by Tennessee's more significant interest in resolving the plaintiff's claim to pierce the corporate veil, since the activities relevant to that analysis took place in Tennessee. *Id.* at *8-9 (citations omitted).

Here, New Jersey's interest in this case is limited to the locale of the subject real estate at issue, and where Plaintiffs attempted to forum shop before the verified complaints were removed to this Court. Yet New Jersey's interest is attenuated with respect to the parties; Plaintiffs themselves are foreign entities, as Delaware and Florida LLCs, and Trane is a Delaware corporation with its principal place of business in North Carolina. FGDI and Three Cubed are the only entities with direct ties to New Jersey, but as set forth in this brief, they are fraudulently joined and will likely not remain in this litigation. In light of Centennial being organized under the laws of Delaware, and even Trane having the same body of law governing its organization, Delaware has the stronger governmental interest in determining whether Centennial has the capacity to proceed with its claims.

- 17 -

### iii.    Under Delaware Law, Centennial Ceased To Be In Good Standing Because It Failed To Pay Taxes

Pursuant to 6 *Del. C.* § 18-1107, a limited liability company "shall pay an annual tax … in the amount of $300," which "shall be due and payable the first day of June following the close of the calendar year." *Id.* at 1107(b), (c).  "A domestic limited liability company that neglects, refuses or fails to pay the annual tax when due shall cease to be in good standing as a domestic limited liability company." *Id.* at 1107(h).  Critically, "[a] domestic limited liability company that has ceased to be in good standing … by reason of [its] neglect, refusal or failure to pay an annual tax <u>may not maintain any action, suit or proceeding</u> in any court," though it may "defend[] any action, suit or proceeding." *Id.* at 1107(l) (emphasis added), (m).

Centennial is a Delaware limited liability company.  (Dkt. No. 1 at ¶¶ 11, 14, 15).  Centennial was formed on December 26, 2018.  *Bender Cert.*, Ex. 5.  As of June 1, 2020, however, Centennial ceased to be in good standing under Delaware law; Centennial has never filed an annual report, and it owes $1,240 in unpaid taxes to the State of Delaware.  *Bender Cert.*, Ex. 6.  Centennial has never filed any required documents with the Delaware Division of Corporations other than those necessary for its initial formation.  *Id.*

According to the Division of Corporations, Centennial has not been in good standing since June 2020.  *Id.*  Further, Plaintiffs have produced nothing in jurisdictional discovery to suggest that the Division of Corporations is incorrect.

- 18 -

Simply, Centennial's claims are plainly and obviously defective by its complete neglect to comply with Delaware law, which results in it lacking the capacity to prosecute this litigation against FGDI and Three Cubed.[4]

### iv. Both Plaintiffs Failed To Produce Certificates Of Authority To Transact Business In the State Of New Jersey

Pursuant to *N.J.S.A.* 42:2C-59(b), "the ownership in [New Jersey] of income-producing real property … constitutes transacting business in [New Jersey]." "Before doing business in [New Jersey], a foreign limited liability company shall obtain a certificate of authority to transact business in [New Jersey]." *N.J.S.A.* 42:2C-58. Critically, "[a] foreign limited liability company transacting business in this State may not maintain an action or proceeding in this State unless it has a certificate of authority to transact business in [New Jersey]." *N.J.S.A.* 42:2C-65(a) (emphasis added).

Plaintiffs are foreign limited liability companies—Centennial was organized in Delaware, and Imarc was organized in Florida. *Bender Cert.*, Ex. 5; Ex. 7. In discovery, Trane demanded that Centennial and Imarc produce all documents

---

[4] Pursuant to 6 *Del. C.* § 18-1108(a), Centennial may cease to *exist* at this juncture because "[t]he certificate of formation of a domestic limited liability company shall be canceled if the annual tax due under § 18-1107 … is not paid for a period of 3 years from the date it is due, such cancellation to be effective on the third anniversary of such due date." The third anniversary of Centennial's first payment, which was due in June 2019, was June 1, 2022.

concerning their formations and registrations.  *Bender Cert.*, Ex. 8 (Doc. Demand Resp. Nos. 1, 9).  Neither Plaintiff produced any certificates of authority to transact business in the State of New Jersey.  *See Bender Cert.*, Ex. 9.  Accordingly, Plaintiffs' claims are plainly and obviously defective due to their failure to comply with New Jersey law, as they do not have capacity to sue *anyone* in any court in New Jersey.

## B.     Plaintiffs' Claims In *Centennial II* Are Barred By The Law Of The Case Doctrine

When Plaintiffs voluntarily dismissed *Centennial I* <u>after</u> this Court entered its decision on the merits on February 25, 2022, dissolving Plaintiffs' temporary restraints, Plaintiffs converted the Court's February 25, 2022 Order from a binding interlocutory order into an unappealable binding final order with *res judicata* effect. *U.S. D.I.D. Corp. v. Windstream Communs., Inc.*, 916 F. Supp. 2d 501, 510 (S.D.N.Y. 2013) (quoting 11 Wright & Miller, Federal Practice & Procedure § 2972) ("'A voluntary dismissal or abandonment of the request of injunctive relief, if it comes after a temporary restraining order has been granted … has the same effect as a final decision that the parties seeking the injunction were not entitled to it.'"), *vac'd in part, aff'd in relevant part*, 775 F.3d 128, 139 (2d Cir. 2014) ("By voluntarily dismissing its suit, the plaintiff has, in effect, abandoned its right to 'a full opportunity to present [its] case[] [or] of a final judicial decision based on the actual merits of the controversy.'").

- 20 -

Since the February 25, 2022 Order has been set in stone as a final and binding adjudication (including the Court's conclusion that Plaintiffs have no chance of success on the merits), the attempted joinder of FGDI and Three Cubed, premised on the same exact rejected theory, is patently and obviously defective. Accordingly, on this independent ground, FGDI and Three Cubed are fraudulent joined and must be dismissed. *See Monroe v. Ethicon, Inc.*, No. 19-5384, 2019 U.S. Dist. LEXIS 219722, at *33-34 (E.D. Pa. Dec. 23, 2019) (fraudulent joinder applied where claims against defendant were barred by law of the case).

**C.    Plaintiffs Cannot Possibly State A Viable Claim Against FGDI And Three Cubed For Tortious Interference With Prospective Contractual Relations**

In the Verified Complaint in *Centennial II*, Plaintiffs asserted one frivolous claim against FGDI and Three Cubed for "Tortious Interference with Prospective Contractual Relations." (Dkt. No. 1-1, Ex. A at Pg. 14-15). Even before addressing the basic elements of Plaintiffs' claim, it is patently frivolous because neither FGDI nor Three Cubed are necessary or real parties in interest.

FGDI has *nothing* to do with the transaction at issue other than it is an entity that is related to Three Cubed through common ownership, and Three Cubed is the predecessor entity to the current purchaser of the Trane Units, Centennial Greek, LLC. (Dkt. No. 13 at Pg. 7, Ex. K). Prior to Plaintiffs initiating *Centennial II*, Three Cubed assigned its rights to purchase the Trane Units to Centennial Greek, LLC, on

March 2, 2022.  *Bender Cert.*, Ex. 10.  In the Verified Complaint, Plaintiffs do not allege that FGDI or Three Cubed have committed wrongdoing against them other than merely attempting to purchase the Trane Units, and Plaintiffs phrase their relief in the form of a hypothetical against the *wrong* entities—that "if Trane sells [the Units] to Three Cubed or [FGDI], [they] must sell [the Units] to Plaintiffs."  (Dkt. No. 1-1, Ex. A at Pg. 2).  Plainly, Plaintiffs have not asserted ripe, justiciable claims against FGDI and Three Cubed, but instead filed a hypothetical and impossible request for relief in the event Trane's sale to a *different entity*, Centennial Greek, LLC, is completed.

Further, a lenient and unsearching review of the basic elements for Plaintiffs' claim against FGDI and Three Cubed reveals that it is patently frivolous.  "Tortious Interference with Prospective Contractual Relations," requires the plaintiff to state: "(1) that [it] had a reasonable expectation of an economic benefit or advantage; (2) that defendant knew of plaintiff's expectancy; (3) that defendant wrongfully and intentionally interfered with this expectancy; (4) a reasonable probability that but for defendant's wrongful interference, plaintiff would have realized the economic benefit; and (5) that plaintiff was injured as a result of defendant's conduct."  *Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 256 F. Supp. 2d 249, 288 (D.N.J. 2003).

As Plaintiffs were fully aware when they filed the Verified Complaint in *Centennial II*, their "right of first refusal" does not exist, and this Court has already

held that Plaintiffs do not have a reasonable probability of realizing an economic benefit from their non-existent "right of first refusal."  Beyond that, it is impossible for Plaintiffs to establish any wrongdoing or malice by merely intending to purchase the Units from Trane.  Plaintiffs' claim, following this Court's February 25, 2022 Order, shifted to a nebulous theory that their right of first refusal is "ambiguous," but that argument inherently contradicts the conclusory allegation in the Verified Complaint that FGDI and Three Cubed intentionally and knowingly interfered with Plaintiffs' contractual rights.  Further, Plaintiffs' claim is self-defeating and circular; Plaintiffs' non-existent "right of first refusal" cannot be triggered absent an offer from another buyer—thus, without any offer from FGDI, Three Cubed, or any other entity, Plaintiffs' ethereal right of first refusal, and apparent basis for *any* cause of action, would not have vested.

These obvious defects with Plaintiffs' claim against FGDI and Three Cubed authorize this Court to conclude that Plaintiffs fraudulently joined FGDI and Three Cubed.  *See Boyer*, 913 F.2d at 112.

## II.    EVEN IF NOT FRAUDULENTLY JOINED, FGDI AND THREE CUBED ARE NOMINAL PARTIES, THUS THEIR CITIZENSHIP IS NOT CONSIDERED FOR PURPOSES OF DIVERSITY

Even if the Court generously considers FGDI and Three Cubed to not be fraudulently joined, their citizenship should still be disregarded because they are nominal parties.  *Spring-Ford*, 158 F. Supp. 2d at 484 n.4 (quoting *Bumberger v.*

*Insurance Co. of N. Am.*, 952 F.2d 764, 767 (3d Cir. 1991)) (holding, in the alternative, that even if the non-diverse defendants were not fraudulently joined, complete diversity would remain intact).  "Nominal parties are generally those without a real interest in the litigation."  *Bumberger*, 952 F.2d at 767.  "'[A] federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy.'"  *Id.* (quoting *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461, 64 L. Ed. 2d 425, 100 S. Ct. 1779 (1980)).

The analysis from *Spring-Ford* is squarely applicable here.  FGDI and Three Cubed's connection to this litigation is, at best, attenuated.  Under *Fed. R. Civ. P.* 19, FGDI and Three Cubed are not even necessary for the Court to award the relief that Plaintiffs seek (to be clear, there is no basis to award Plaintiffs any relief).  So, even if the Court is concerned that there is a mere possibility that Plaintiffs could state a claim against FGDI and Three Cubed, however remote, the Court is still permitted to ignore FGDI and Three Cubed's citizenship because they are nominal parties that Plaintiffs added to disrupt this Court's jurisdiction.

## III. RUBIN'S MEMBERSHIP INTEREST IN CENTENNIAL IS A SHAM DESIGNED TO MANIPULATE THIS COURT'S JURISDICTION

To the extent the Court deems it necessary to analyze Plaintiffs' claim that Jonathan Rubin is a legitimate member of Centennial, thereby making Centennial a citizen of New Jersey for diversity purposes, Defendants submit that Rubin's membership is a sham.  Documentary evidence confirms that Rubin never obtained

- 24 -

an enforceable interest in Centennial, and that Plaintiffs' purported obligations and rights in their various overlapping agreements are, at best, optional. At bottom, only Ira Russack is conclusively a member of the limited liability company, thus Centennial is a citizen of New York only.

In short, though Plaintiffs insist that Rubin had a valid membership interest in Centennial, Rubin's contracts with Plaintiffs, Russack, and Sprei are shams that are legally ineffective and illusory. *See, e.g.*, *United States v. Wexler*, 31 F.3d 117, 127 (3d Cir. 1994) (rejecting sham transactions designed to manipulate tax liability); *In re Cendant Corp. Litig.*, 264 F.3d 286, 300 (3d Cir. 2001) (discussing unenforceability of illusory contract terms); *Bryant v. City of Atl. City*, 309 N.J. Super. 596, 707 A.2d 1072, 1085 (App. Div. 1998) ("[I]f performance of an apparent promise is entirely optional with a promisor, the promise is deemed illusory.").

### A.    Rubin's Narrative That He Has A Membership Interest In Centennial Through A Converted Loan Is Defective

On March 25, 2022, Plaintiffs filed the Certification of Jonathan Rubin (the "*Rubin Cert.*"), declaring that Rubin had a membership interest in Centennial, and that as a New Jersey resident, Rubin destroyed complete diversity amongst the parties. (Dkt. No. 17-1).[5]

---

[5] Rubin allegedly resides in Lakewood, New Jersey.

The narrative supplied in Rubin's certification, describing the mechanics of his purported membership interest in Centennial is, at best, convoluted. Rubin is the sole member of an entity called Queens Equities, LLC ("QE"), which is Rubin's "investment company" that he formed in 2001. *Rubin Cert.* at ⸿ 3. Rubin claims that in 2020, he and his attorney, Adam Kalish, Esq., began to negotiate with an undefined and unnamed "buyer" of "two condo units"[6] for "One Centennial Plaza, Piscataway, New Jersey"—to evidence the transaction, Rubin cites an "Agreement of Payment" between QE and an entity called "330 Carter Equity LLC" (hereafter "330 Carter"). *Rubin Cert.*, Ex. C. The "Agreement of Payment" had the following terms:

- QE lent $400,000 to be paid back by 330 Carter within 30 days, (Pg. 1);

- In the event "Crown Bank" loaned money to 330 Carter, QE's debt interest could be "converted into equity," though no description is provided of the "equity," (⸿ 2);

- The maturity of the loan depended on the closing of one of two properties, either "5218 Atlantic Avenue" or "One Centennial," (⸿ 3);

---

[6] Though Rubin's certification never defines the real estate that is the subject of his transaction, presumably the numerous documents that he attaches to his certification refer to Plaintiffs' Units, which are Units B and C of One Centennial Avenue, Piscataway, New Jersey.

- The "Agreement of Payment" contains a merger clause, indicating that it is the "Entire Agreement" between the parties, (¶ 6.a);

- The "Agreement of Payment" was signed only by Russack on behalf of "Borrower," (Pg. 3).

*Rubin Cert.*, Ex. C.  The Agreement of Payment makes no reference to Centennial, and it is unclear how the Agreement of Payment is relevant to Centennial—Plaintiffs never set forth any explanation or facts for why the contract with 330 Carter matters. (*See generally id.*).

Rubin certified that on May 4, 2020, "we reached an agreement," and he lent undefined and unnamed "buyers" $565,000 to purchase the Plaintiffs' Units.  *Rubin Cert.* at ¶ 5.  To support his assertions, Rubin attached the "Note," which provided, in relevant part:

- The parties to the Note are "1 Centennial Avenue Prop LLC., a New York Limited Liability Company" (hereafter "1 CAP LLC"—this is *not* the same Centennial that is the plaintiff in this litigation) and QE, (Pg. 1);

- QE loaned 1 CAP LLC $565,000, (Pg. 1);

- 1 CAP LLC owed QE monthly interest-only payments commencing on June 1, 2020 in the amount of $6,120.83, yet simultaneously, the entire loan matured and was due on July 1, 2020, (Pg. 1);

- The debt could "immediately convert into a membership interest of the LLC" in the event of default "after the expiration of any applicable notice and grace periods," (Pg. 2);

- The Note indicated that it could not be amended or modified without a signed writing by the parties, (Pg. 2);

- 27 -

- Russack signed on behalf of 1 CAP LLC, (Pg. 4).

*Rubin Cert.*, Ex. D.  Like the Agreement of Payment, the Note makes no reference to Centennial.  (*Id.*).

Rubin asserts that Centennial and Imarc purchased the Plaintiffs' Units, and that the equity-to-debt conversion provision in the Note to 1 CAP LLC was "incorporated into section 7.1.5 of the Amended Operating Agreement of the purchasing entity, that was executed on May 12, 2020." *Rubin* Cert. at ⁋ 7.  As an exhibit, Rubin attaches the Amended Operating Agreement of Centennial, which contains a litany of terms that Plaintiffs blatantly <u>failed to comply with</u>:

- Transfers of membership interests in Centennial were *ineffective* unless accompanied by: (i) an assignment and indemnification signed by both the transferor and transferee; (ii) an agreement to be bound by the Amended Operating Agreement executed by the transferee; and (iii) if requested by Centennial, an opinion of counsel regarding the registration requirements for transfer of securities (§§ 7.1.2, 7.1.3);

- If Centennial intends to operate under names other than "Centennial Plaza Prop LLC," it must do so "by filing the appropriate assumed named affidavit(s) and/or certificate(s) with the governing authorities," (§ 1.2);

- Centennial was required to have a bank account opened in its name and to maintain books and records, (§§ 5.1, 5.2);

- The membership roll of Centennial, including "the name of each Member, and each Member's percentage of membership interest . . . is set forth on Schedule A attached hereto and made a part

hereof," (§ 1.6), and each members' capital contributions must be set forth on Schedule A, (§§ 2.1, 2.2)[7];

- Centennial was required to maintain "capital accounts" for each member, profit and loss of Centennial would be allocated through the capital accounts, and cash flows of Centennial would be distributed through the capital accounts, (§§ 2.3, 3.1, 3.2);

- Centennial "acknowledge[d] receipt of $565,000.00 and $365,000.00 from [QE]," and that in the event of a default by Centennial, "Jonathan Rubin shall be authorized to install a management company of his choosing to manage the property and ensure payment of the notes," (§ 4.1.2);

- All notices must be in writing, (§ 8.1); and

- The Amended Operating Agreement contains a merger clause, indicating it "constitutes the complete and exclusive statement of the agreement among the parties," and it cannot be amended without express written consent of all members, (§ 8.2).

*Rubin Cert.*, Ex. E.  The provisions in §§ 7.1.2 and 7.1.3 of the Amended Operating Agreement are dispositive—any transfer of interest from Russack to Rubin was *ineffective* because Plaintiffs have not produced any evidence that Rubin's acquisition was accompanied by (i) an assignment and indemnification signed by both he and Russack; (ii) an agreement signed by Rubin to be bound by the Amended

---

[7] Schedule A is not attached to the Amended Operating Agreement of Centennial in Rubin's certification, but in a subsequent version dated August 11, 2020, Russack is listed as having a 100% membership interest, *Bender Cert.*, Ex. 4.  Plaintiffs have never produced a version of Schedule A that sets forth capital contributions.

Operating Agreement; nor (iii) an opinion of counsel regarding the registration requirements for transfer of securities. *See id.; see also Bender Cert.*, Ex. 4.

Rubin certified that he communicated with the "representatives of Centennial" in "late summer of 2021" to convert the $565,000 loan into a membership interest in Centennial, and that he sent a letter to Russack on September 6, 2021, confirming the conversion. *Rubin Cert.* at ₱₱ 10-11. The letter attached to the certification incorrectly stated the property address, date for the Note, and ownership stake calculation. *Rubin Cert.*, Ex. F. Rubin was alerted of the errors in his letter by "Centennial representatives," and a corrected letter was sent on September 7, 2021. *Rubin Cert.* at ₱₱ 11-13. According to the letter, Rubin elected to convert QE's debt interest into an equity interest of 14.6%—though the letter fails to define terms, presumably QE intended to obtain a 14.6% membership interest in Centennial. *Rubin Cert.*, Ex. G. The September 7, 2021, letter was countersigned by Russack on September 8, 2021. (*Id.*). Rubin certified that the September 7, 2021, letter memorialized that QE "became a 14.6% owner of the entity that owns the Property." *Rubin Cert.* at ₱ 14. Lastly, Rubin attached a 2021 IRS Schedule K-1 for Centennial to reflect QE's 14.6% "share of profit, loss, and capital," that QE contributed $565,000 in capital in 2021, and that QE had a net loss of $65,225 in 2021. *Rubin Cert.*, Ex. H.

- 30 -

Again, none of these documents establish what was required under the Amended Operating Agreement for Centennial—nothing in the September 6th or September 7th letters comply with the requirements of §§ 7.1.2 and 7.1.3. Accordingly, Rubin's bald conclusion that he became a member of Centennial, without observing any of the requirements of the documents that he relies upon, confirms that his loan and ownership of Centennial are illusory.

**B.     During Jurisdictional Discovery, Plaintiffs Failed To Produce Evidence That Russack Transferred A Membership Interest To Rubin In Accordance With The Amended Operating Agreement**

In discovery, Plaintiffs produced documents and supplied narratives that revealed Rubin's purported ownership in Centennial was neither accurate nor comprehensive, and that Plaintiff's theory of membership is even more convoluted than as set forth in Rubin's certification. Critically, nothing produced by Plaintiffs disturbed Rubin and Plaintiffs' failure to comply with §§ 7.1.2 and 7.1.3 of Centennial's Amended Operating Agreement.

**i.     Counsel's Narrative That Rubin Funded A Loan To Centennial By Wiring "Back" $500,000 Owed To A Different Corporate Entity Is Baseless**

Beyond the failure to follow contractual formalities, Plaintiffs revealed facts that demonstrate that the "loan" from Rubin was not actually funded. Contradicting Rubin's certification, Plaintiffs' counsel stated that Rubin did not begin to negotiate to purchase the Plaintiffs' Units in 2020—he purportedly has another company

- 31 -

called "NIDATS Corp." which attempted to purchase the units in 2017. *Bender Cert.*, Ex. 11. Plaintiffs set forth a narrative that Rubin had contracted to purchase Plaintiffs' Units himself, then assigned his interest to Plaintiffs, and that contract negotiations dragged out for years until financing was secured in April of 2020. (*Id.*). At that time, Plaintiffs (instead of NIDATS) purchased the units from the prior owner, but NIDATS was reimbursed for an undescribed fee that it paid to the seller prior to the closing. (*Id.*). In connection with Plaintiffs' purchase of the units, on May 4, 2020, fees were reimbursed to NIDATS in the amount of $2,000,000. (*Id.*). Rubin, on behalf of NIDATS, allegedly instructed Kalish, as his attorney, to wire $500,000 of the $2,000,000 reimbursement "back" to Plaintiffs, and that would be the loan memorialized by Exhibit D to Rubin's certification. (*Id.*).

As set forth in detail below, even this new narrative raises more questions than answers, and subsequent narratives result in even more contradictions and revisions of Rubin's purported history of becoming a member.

### ii. The Certification of Sam Sprei Adds More Contradictory And Convoluted Facts To Rubin's Alleged Membership

Later in discovery, Plaintiffs supplied the Certification of Sam Sprei ("*Sprei Cert.*") (attached to the *Bender Cert.* as Exhibit 12). Sprei certified, consistent with Plaintiffs' counsel's narrative, that Rubin began to negotiate to purchase the Plaintiffs' Units, though his company was spelled differently—"NIDNATS" rather than "NIDATS," and that NIDNATS assigned its contract to purchase the units to

- 32 -

Russack. *Sprei Cert.* at ¶ 6. The assignment attached to the *Sprei Cert.*, however, refers to NIDATS, and the assignment is to an entity that is not Plaintiff Centennial; the contract was assigned to "Centennial Avenue Prop LLC" (hereafter, "CAP LLC"), which is yet another entity separate from Centennial and 1 CAP LLC. *Sprei Cert.*, Ex. A.

The *Sprei Cert.* adds more lenders and entities to the transaction—Russack and Centennial apparently could not afford to purchase the Plaintiffs' Units, so Russack borrowed $500,000 from an individual named Abraham Lesser, and he memorialized the transaction by signing a promissory note. *Sprei Cert.* at ¶¶ 8-9, Ex. B. To pay off Lesser, Centennial and Russack borrowed $915,000 from Rubin, broken down into two separate notes for $565,000 and $350,000. *Sprei Cert.*, at ¶¶ 11-12, Ex. E. While the promissory notes are made to 1 CAP LLC and CAP LLC, and not Centennial, Sprei certifies to the legal conclusion that they are one in the same as Centennial, without documentation or authority. *Sprei Cert.* at ¶ 14. This legal conclusion is contradictory to both the Amended Operating Agreement of Centennial, *Rubin Cert.*, Ex. E, § 1.2, as well as both New Jersey and Delaware law, which have very strict requirements for how LLCs are named and use trade names. *See, e.g.*, 6 *Del. C.* § 18-102; *N.J.S.A.* 42:2C-61.

The *Sprei Cert.* reiterates that Kalish was Rubin's attorney, and that Kalish's office processed the $915,000 in loan proceeds from Rubin to Centennial. *Sprei Cert.* at ¶ 16. However, the funds were not distributed directly to Centennial:

- $157,000 was transferred to "Centennial Plaza owned by [] Russack";

- $250,000 was transferred to "Shambala owned by [] Russack";

- $500,000 was transferred to "Nachle Management, LLC (owned by Abraham Lesser's son)"; and

- $8,000 was apparently retained by Kalish as a legal fee for closing the transaction.

*Sprei Cert.* at ¶¶ 16-17. To support his recitation, Sprei attached the purported wire-transfer log of "Kalish P.C.," but the unredacted transactions do not reflect Sprei's statements. *Sprei Cert.*, Ex. F. Instead, the ledger shows that between May 6 and May 8, 2020, the following transactions took place:

- $250,000 was wired to "Shambhala Realty LLC" on May 6, 2020;

- $458,000 was wired to "Progressive Real Estate Agency LLC" on May 6, 2020;

- On either May 6 or May 7, a redacted transaction credited the Kalish P.C. account $127,000;

- $127,000 was wired to "Progressive Real Estate Agency LLC" on May 7, 2020;

- On either May 7 or May 8, a redacted transaction credited the Kalish P.C. account $157,500; and

- 34 -

- $157,500 was wired to "1 Centennial Plaza LLC" on May 8, 2020. "1 Centennial Plaza LLC" is yet another entity, and it is not the name of 1 CAP LLC, CAP LLC, or Centennial.

*Sprei Cert.*, Ex. F. Plainly, the Kalish P.C. wire ledger does not reflect the facts recited by Sprei.

The *Sprei Cert.* thereafter reiterates the narrative from Rubin's certification that the Note to 1 CAP LLC was incorporated into the Amended Operating Agreement of Centennial, and that Rubin ultimately exchanged a letter with Russack, dated September 7, 2021, that memorialized his membership stake in Centennial. *Sprei Cert.* at ¶¶ 18-26, Exs. G-I. The *Sprei Cert.* differs from the *Rubin Cert.* in that each attach different versions of the September 7, 2021, letter from Rubin to Russack. *Compare Rubin Cert.*, Ex. G *with Sprei Cert.*, Ex. I. In Sprei's version, the letter indicates the property address as "Parsippany," the ownership computation is partially incorrect, and the letter is not countersigned by Russack. *Sprei Cert.*, Ex. I.

In short, even if the Court were to accept the *Sprei Cert.* as valid revisions (rather than contradictions) to the *Rubin Cert.* and Plaintiffs' counsel's April 29, 2022 letter, it too confirms that Rubin's membership stake is illusory.

### iii. The Documents Produced By Plaintiffs Refute Their Narratives, And Confirm That Rubin's Membership In Centennial Is A Sham

The narratives from Plaintiffs' counsel, the *Rubin Cert.*, and the *Sprei Cert.* are not supported by the documents produced in discovery, and even the documents Sprei, Rubin, and Plaintiffs' counsel directly cite to in their narratives contradict their own recitations of the facts. The extensive list of defects with Plaintiffs' position is further proof that Rubin's membership in Centennial is, at best, a sham.

***First***, the $500,000 reversion of the funds owed to NIDNATS from the closing on April 28, 2020, through which Plaintiffs purchased their units, is a *different* amount of money than the amount QE allegedly loaned Centennial, as the Note memorialized a $565,000 loan obligation. *Bender Cert.*, Ex. 11; (Dkt. No. 17-1, Ex. D).

***Second***, it is unclear why (or on what authority) Rubin would direct Kalish to move funds as *his* attorney, because the retainer agreement produced in discovery by Plaintiffs is not between Kalish, as attorney, and Rubin, as the client; it is signed by Russack as the client, and Rubin is not mentioned at all. *Bender Cert.*, Ex. 13.

***Third***, regarding the assignment from NIDNATS to Plaintiffs to purchase their units, the version cited by Plaintiffs' counsel is *not* signed by Rubin or anyone else on behalf of the assignor. *Bender Cert.*, Ex 14. The version attached to the *Sprei Cert.* appears to be a "correct[ed]" version to fix typographical errors and

adjust contract terms, but even that version is not signed by Rubin or anyone else. *Sprei Cert.*, Ex. A.  Even if it were signed, the entity referred to as "NIDATS" in the assignment does not legally exist—counsel's letter refers to "NIDATS" and "NIDAST" as the original contracting entities for the units, and that NIDATS assigned its interest to Plaintiffs.  *Bender Cert.*, Ex. 11.  The *Sprei Cert.* refers to NIDNATS, which appears to be the correct entity.  According to the New York Department of State, Division of Corporations, "NIDATS" and "NIDAST" are not recognized entities, but "NIDNATS" exists, and that company was the original party that contracted to purchase the units in 2017.[8]  *Bender Cert.*, Exs. 15, 16.  These appear to be more than careless misspellings, as NIDATS has an address of 1501 Broadway, New York, New York, and NIDNATS correspondence is directed to Olden Equities Group (*i.e.*, Sam Sprei), at an address of 4203 13th Avenue, Brooklyn, New York.  *Bender Cert.*, Ex. 15 (CENT000244); Ex. 14 (CENT000277).  So while

---

[8] Complicating matters further, Plaintiffs produced documents indicating that when Plaintiffs were closing on their purchase of their units in 2020, correspondence was sent from "NIDATS LLC," and a "Notice of Time of the Essence" was sent from "seller NIDATS Corp LLC," (who was plainly not the seller of the units). *Bender Cert.*, Exs. 17-18.  Meanwhile, the Note refers to "Niadat," *Rubin Cert.*, Ex. E at § 7.1.5, and the September 6 and 7, 2021 letters between Rubin and Russack reference "NAITID." *Rubin Cert.*, Exs. F-G.  Plaintiffs, in their interrogatory responses, designate that Plaintiffs, and not Rubin, have an interest in "NIDSAT Corp." *Bender Cert.*, Ex. 19 (Interrog. Resp. No. 10).  Undersigned counsel has searched public records, and other than NIDNATS, *none* of these other variations exist as registered or recognized entities.

NIDNATS entered an agreement to purchase the units, it never assigned its interests because the assignment was signed by NIDATS Corp. *Bender Cert.*, Ex. 14. Further, the assignment was not to both Plaintiffs; the parties to the assignment are the non-existent NIDATS Corp., Imarc, and CAP LLC, not Centennial. *Bender Cert.*, Ex 14 (CENT000276-277); *Sprei Cert.*, Ex. A.

**_Fourth_**, Plaintiffs produced a document titled "Heter Iska – Investment Agreement" that appears to govern and supersede Russack and Rubin's agreements regarding QE's purported loan to Centennial. *Bender Cert.*, Ex. 8 (Doc. Demand Resp. No. 3); Ex. 20. The Heter Iska purportedly controls Centennial and QE's "joint venture" concerning $915,000 that QE loaned to Centennial, and it provides that "all conditions and terms contained in this [Heter Iska] shall supersede any and all contracts entered into between" Centennial and QE. *Bender Cert.*, Ex. 20. It further provides that it "shall supersede and take precedent over the Mortgage, Note, etc. [] between Centennial … and [QE]," which "only … secure active partners['] obligations under this agreement, but in no way bind the active partner more than this agreement." (*Id.*).

**_Fifth_**, Plaintiffs have not produced any evidence that Rubin, through QE or otherwise, actually funded a $565,000 loan (or any loan for that matter) to Centennial. While it is questionable that Rubin had the ability to fund any loans, based on his collection of unemployment benefits from the State of New Jersey in

- 38 -

2021, *Bender Cert.*, Ex. 21, Plaintiffs have not supplied documentary evidence showing that any proceeds originating from Rubin were ever received or disbursed to Centennial. In Trane's third, fourth, and fifth interrogatory demands, and its sixth and seventh document demands, Trane demanded that Plaintiffs identify all transfers of funds between Plaintiffs and their members, identify all facts establishing that Rubin's loan was funded, and identify all banks accounts that were used to transfer funds for the loan. *Bender Cert.*, Exs. 8, 19. Yet, Plaintiffs have not produced any documentary evidence memorializing that Centennial received a cent of loan proceeds from Rubin.

Particularly with respect to accounting records, bank documents, tax records, and financial records—which under Centennial's Amended Operating Agreement and by law are *required* to exist, *Rubin Cert.*, Ex. E, §§ 2.3, 3.1, 3.2, 5.1, 5.2, 7.1.2, 7.1.3; 6 *Del. C.* §§ 18-305, 18-502 to -504; *N.J.S.A.* 42:2C-32 to -35, -40— Defendants are entitled to an adverse inference that: (i) Plaintiffs' failure to produce these documents confirms that the documents do not exist; and (ii) that the transactions necessary for Rubin's loan to be legitimate did not actually happen. *See, e.g., Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 520 (D.N.J. 2008) (setting forth elements for entitlement to an adverse inference). Plaintiffs' sheer lack of formality and precision with nearly every aspect of Rubin's transaction proves that the terms of Rubin's arrangement with Centennial and Russack are, at best, illusory.

- 39 -

## CONCLUSION

For the reasons set forth above, the Court should confirm its jurisdiction, deem FGDI and Three Cubed as fraudulently joined defendants, dismiss FGDI and Three Cubed from the case, and proceed to adjudicating the remaining claims in this litigation on the merits.

**REED SMITH LLP**

*/s/ Aaron M. Bender*
Aaron M. Bender, Esq.

Dated: June 13, 2022